## SHAW *v.* COLWELL LEAD CO.[*]

### *(Circuit Court, S. D. New York.   March 18, 1882.)*

1. **PATENTS FOR INVENTIONS — REISSUE 3,744 — TIN-LINED LEAD PIPE — VALIDITY OF.**

   The second claim of reissue No. 3,744, for "the manufacture of lead-encased tin pipe from a compound ingot, composed of concentric parts of lead and tin, when the central ingot is made of tin in the form of superposed inverted frusta of cones, or their equivalents," construed, and *held* valid.

2. **SAME — REISSUE — DEFENCES — PUBLIC USE.**

   The application for a reissue is not an application for a patent, but for the amendment of one, and is not such an application as must be made before two years of public use have been had.

3. **SAME — UTILITY — PATENTABILITY.**

   To be patentable, inventions need not be superior to or better than all other things known before; it is sufficient if they are useful in themselves, if they are also new.

4. **SAME — PERMISSIVE USE — JURISDICTION.**

   Though in itself the defence of permissive use, if acknowledged by complainant, might be a bar to a suit for infringement, yet if the defendant, in his answer and proofs, attacks the validity of the patent and denies all recognition of its validity, such denial leaves the complainant his standing in court, and a defence to the infringement must be made out to defeat his right of recovery.

In Equity.   Final hearing.

*Amos Broadnatt,* for orator.

*Ten Eyck & Remington,* for defendant.

WHEELER, D. J.   This suit is brought for relief against infringement of letters patent reissue No. 3,744, dated November 23, 1869, for an improvement in the manufacture of tin-lined lead pipe.   The bill alleges the grant of the original letters, No. 74,613, dated Feb-

[*]Reported by S. Nelson White, Esq., of the New York bar.

ruary 18, antedated February 6, 1868, to the orator; the assignment of them by the orator to Peter Naylor, upon terms that he should pay the expenses of a reissue, prosecute infringers, and pay one-half the net profits to the orator; the reissue to Naylor, assignee of the orator; infringement by the defendant ever since the grant of the reissue; and the reconveyance of the patent, and assignment of all rights of action for infringement, on the seventeenth day of September, 1877, before the bringing of the bill. The answer sets up that the invention had been previously patented in England to George Alderson in English letters patent No. 2,749, on the twenty-fifth day of February, 1804, and to the orator and Gardner Willard in letters patent of the United States No. 41,401, dated January 26, 1864; that the invention was in public use and on sale, for more than two years prior to the application for the reissued patent, with the knowledge, consent, and allowance of the orator; that the orator, during the years 1866, 1867, and 1868, was the treasurer of the defendant, and allowed the defendant to use the invention; and, by a general denial of so much of the bill as is not otherwise answered, denies infringement. These are the only questions made by the answer that are continued in the evidence or insisted upon in argument; there are others raised by the evidence and insisted upon.

As lead pipe is made by forcing a short and very thick-walled piece through dies, when softened by heat, and thereby making it into a much longer piece of the same sized bore and of the required thickness of wall, so tin-lined lead pipe is made by forcing a like short piece, composed of tin next to the bore and lead outside, through similar dies, when softened by heat, thereby making a much longer piece of pipe, with the inside of tin and the outside of lead. The great difficulty in making it successfully lay in so shaping and proportioning the parts of tin and lead in the short piece that when forced through the dies the inside would be of tin and the outside of lead, each of proper uniformity and thickness. This invention was not of tin-lined lead pipe, for the patent assumed that to be before known, nor of machinery for making such pipe, nor of arranging tin within lead for the purpose of being so forced through dies; for these were either mentioned or described in the patent, and not claimed. The bodies of the tin and lead, when arranged in the short piece, ready to be forced through, are called ingots, and the whole a charge, in the trade. The specification of the patent set forth a central ingot of tin, of the outward form of an inverted double frustum of a cone, the upper frustum containing a little more metal, and being a little

shorter and more tapering than the lower one, encircled by an inter-mediate lead ingot, of the outward form of an inverted frustum of a cone, having a deep circular cavity, marked D, in the upper end of the ingot, and an outer ingot of lead, of the outward form of a cylinder, including the others, and described, making the lead ingots first, and casting the tin ingot in the intermediate lead one, which, as the tin would melt at lower temperature than the lead, would ·permit so casting them together without alloying the tin with the lead. There were four claims in the original patent.

(1) Making the charge of metal in three distinct parts, as described, and uniting them either before or after they are put in the cylinder. (2) Making the central ingot or charge of tin, in the form of a double frustum of a cone, or its equivalent, for the purpose of securing a uniform thickness of tin in the lead tube or pipe. (3) Making the intermediate lead or alloy ingot in the form of a frustum of a cone, substantially as described. (4) Making the cavities, D, in the upper end of the charge for the purpose specified.

There are likewise four claims in the reissue:

(1) The manufacture of lead-encased tin pipe from ingots or a charge of metal, made, substantially as herein described, of three parts, whether the same be united before or after they are put in the cylinder. (2) The manufacture of lead-encased tin pipe from a compound ingot, composed of concentric parts of lead and tin, when the central ingot is made of tin, in the form of superposed inverted frusta of cones, or their equivalent. (3) In the manufacture of the compound ingot for lead-encased tin pipe, the employment of an intermediate cone or cones whereby a large portion of the lead ingot may be cast without contact with the tin, thus reducing the alloying of the two metals. (4) In the manufacture of the compound ingot as herein described, the formation of the tin ingot of superposed inverted frusta of cones, the upper one being of larger diameter but proportionately shorter than the other.

No question has been made but that the reissued patent is properly supported by the original. The infringement claimed is described by the orator himself in answer to cross-question 236, and consists in making a lead ingot in the form on the inside of the outside of superposed inverted frusta of cones, and placing accurately in the center a pipe of tin, of the same height, and filling the space between them with melted tin, making a central ingot of tin of the outward form of superposed inverted frusta of cones, encircled by an ingot of lead of the outward form of a cylinder. Here is no charge of metal in three parts, as described in the first claim, nor of inter mediate cones or ingots, as described in the third claim of each pat-ent, nor of cavities, D, as described in the fourth claim of the original, nor of an upper frustum of a cone of larger diameter, but

proportionately shorter than a lower one, as described in the fourth claim of the reissued patent. There is nothing but the central tin ingot in the form of superposed inverted frusta of cones, described in the second claim of each.

The patent of Alderson describes a charge of metal for drawing into tin-lined lead pipe, composed of a central ingot of tin cast into a hollow cylinder of lead, making the tin ingot cylindrical in outward form, and anticipates nothing in the claims of either patent, and nothing described in either, to be referred to by the claims, except the casting the tin into the lead, which may prevent alloying, as mentioned. The patent of Shaw and Willard, set up in the answer, is for a tin ingot tapering at the lower end and enlarging at the upper, either cast into a lead ingot shaped to receive it, or with a lead ingot cast about it. This latter patent and the patent in suit might infringe upon Alderson's patent, if that was in force; but these are for forms of ingots different from his, and are only for these improvements in form, and are not anticipated as such by the form in his. And for the same reason the Shaw and Willard patent does not anticipate this. That is for one form of ingot, and this is for another, and as such each stands independent of the other. The second claim is for the manufacture of lead-encased tin pipe from such ingot. If this means the manufactured article, as a product, both those patents would anticipate this in description, for they both describe such pipe; and in fact this would anticipate itself, and on its face would claim nothing patentable, for it mentions and describes the making of such pipe before; but the word is not understood, and in argument is not claimed, to have been used in that sense. It is understood to have been used as a verbal noun, signifying the making such pipe from such ingots, as set forth in the corresponding claim in the original patent. Such construction seems warrantable by the authorities. Curtis, Pat. §§ 26, 27.

The point against the validity of the patent on account of public use for two years before the date of the reissue, seems to rest upon the supposition that the statutes making such use a defence to a patent apply to the patent in suit, and to the application for that, whether it be an original patent or a reissued patent. No case is cited in support of the proposition, nor has any to the contrary been cited or noticed, but there are a great many in which patents have been upheld that could not have been if this would be a defence and it had been made. The language of the statutes is opposed to such construction. In section 15 of the act of 1836, this defence, as pro-

vided, is the being in public use or on sale with the consent and allowance of the patentee before his application for a patent. Section 7 of the act of 1839 limits this defence to cases of such sale or prior use for more than two years prior to such application for a patent. The same expression is continued in Revised Statutes, section 4886, providing for granting patents, and section 4920, providing for this defence to a patent. And further, the reissued patent is not a new patent, but is only an amended form of an old one, and the application for the reissue is not an application for a patent, but is an application for an amendment of one; and that cannot be such an application as is referred to as being necessary to be made before two years of public use shall have been had.

There is a question made in the evidence and insisted upon in the argument, as to whether this form of ingot is any better or makes any better pipe than prior forms, and whether, if it does not, there is any utility to support the patent. The statutes do not require inventions to be superior to or better than all other things known to be patentable. It is sufficient if they are useful in themselves, if they are also new. There is no question upon the evidence but that this form of ingots is useful in the manufacture of this kind of pipe, nor but that the defendant uses it. If there is another form equally useful, or better, open to use by the defendant, that could be taken; but the right to use that would not defeat the patent for this.

None of the reasons set up or urged against the validity of the patent seem to be sufficient to defeat it. It is insisted, however, that if the patent is valid the use of the invention by the defendant has, upon the ground stated in the answer, as well as others, been so permissive that the defendant is not liable to the orator for it. It is expressly admitted on the record on behalf of the defendant that the orator is the owner of the patent, and of "all the rights which the said Peter Naylor acquired thereunder, and that he became such owner at the time and in the manner alleged in the bill." The right to recover for infringement of a patent, like other choses in action, is assignable in equity, and the real owner of the right is entitled to maintain a suit upon it in equity in his own name. Upon the allegations in the bill and the concession, the orator is the owner of the right to recover for infringements which accrued to Naylor, as well as for any which has accrued to himself since he became re-entitled to the patent itself. Naylor had no right of recovery for anything prior to the date of the reissued patent, November 23, 1869. The permission or estoppel set up in the answer covers only the years 1866, 1867, 1868, and there-

fore can be no answer to the claim for infringement now in controversy, even if any permission from the orator alone would be any answer to a claim for an infringement against the rights of Naylor acquired from him by the orator.

The evidence shows that the defendant brought suit in a state court of New York against the orator, and that the orator set up as a defence to that action, by way of counter-claim, that in the year 1868 he was the owner of the patent and gave the defendant the right to use the invention, for which the defendant agreed to pay him what it was reasonably worth; that the defendant had used the invention; that the use was worth a large sum of money; and that he had a right to collect the gains and profits. And in this present case the orator has testified, in answer to the first interrogatory, that he allowed the defendant to use the invention upon the understanding and agreement of the president and secretary that the company would compensate him for the use. These statements are relied upon and urged as establishing such permissive use. The position of the orator, so taken, if unchallenged by the defendant, might be a good bar to the maintenance of this suit for infringement. ' But the defendant does not set this up as a defence, nor accept it as being the true situation. The validity of the patent is denied in the answer, and all such recognition of its validity is denied in the evidence in effect. The denial of the validity of the patent leaves the orator his standing in this court, and a defence to the infringement must be set up and made out to defeat his right of recovery.

No license is set up. If one, according to these statements, was set up, the statement would be evidence only, and not conclusive; and it would not be safe to say now how such an issue would be found if properly made. These statements refer to time when the orator himself held the patent, and before the conveyance to Naylor. If such permission was given, it might amount to a mere revocable license, of which the conveyance of the patent would be a revocation. No license at all from Naylor is mentioned, and a mere license from the orator would not operate against the rights of Naylor, unless by way of estoppel against these rights in the orator's hands. No foundation for such an estoppel is laid. It does not appear, so far as has been alluded to by counsel, or observed, but the defendant knew of the conveyance to Naylor, and knew that the use of the invention was an infringement of Naylor's rights. The orator had ceased to be an officer of and to be immediately connected with the defendant company, and it is not claimed that when he left he undertook to

agree that the use of the invention patented in this patent might be retained.

The evidence also shows that July 23, 1867, the defendant entered into an agreement with Latham & Bros., a firm, for license to them to use several patents owned by the defendant relating to tin-lined lead pipe and its manufacture, upon certain consideration and royalties. The contract was in writing, executed by the defendant and by that firm, and contained a clause (seventh) providing that the agreement should "remain in force during the continuance of the said patents, and any improvement in the manufacture of the pipe made by either" should "be for the mutual benefit of both of the parties to this agreement." The orator was an officer of the defendant at the time, and it is argued that thereby he became a party to the agreement, and bound himself to not only give to Latham Bros., but to the defendant, any improvement he might make in that manufacture. The defendant was a corporation distinct in legal identity from its officers, and that, not they, was the contracting party on one side of that agreement. The clause seems to refer to two parties only, one on each side, the firm on one side and the corporation on the other, and it does not seem capable of including any others within its scope or operation.

The defendant also insists that it made large outlays upon experiments to ascertain the best form of ingot for these purposes, and that these outlays covered materials for making this form of ingot, and that the orator knew of these experiments and expenditures and did not object to them, and that now he ought not, in justice, to be heard to claim that the use by the defendant of this form of ingot was an infringement upon any one's rights. The defendant does not go so far in this direction as to set up that this invention was known to and used by others in the employ of the defendant prior to the orator's discovery of it, so as to defeat the patent, nor as to show that the expenditures were made in completing this invention, or in developing it, on the faith of any representation by the orator that the defendant should have the use of it. The outlays were made in experiments upon various other forms of ingots. The orator invented this form, and patented it without objection by the defendant or any of its officers, and no expenditure about it is shown other than the making such implements as were necessary to use it. The defendant may have understood that the use made of the invention while the orator was treasurer of the company was permitted on account of that relation, and not wrongful; but that does not cover

the claim of infringement involved in this case. The relation ceased, the patent was transferred to Naylor and reissued, and nothing was done by the defendant to retain or obtain the right to use this invention. The orator obtained other patents alone and as joint inventor, and the defendant carefully obtained the title to them; but it appears to have taken no steps to do the same with this. The defendant may have been misled into supposing it would have the right to use the invention notwithstanding the patent; but, if so, it was without the fault of the orator, so far as is pointed out. Counsel have not called attention to the testimony of any witness, and the testimony of none has been noticed, showing that the orator has at any time said anything to the officers or agents of the defendant to give them to understand that he should not insist upon his patent.

Let a decree be entered that the orator is the owner of the patent; that the second claim is valid; that the defendant has infringed that claim; and for an injunction and an account, with costs.